NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SWEPCO TUBE LLC,** | |
| Plaintiff, | Civil Action No. 07-cv-767 (PGS) |
| v. | **OPINION** |
| **LOCAL 427, IUE-CWA, AFL-CIO** | |
| Defendant. | |

**SHERIDAN, U.S.D.J.**

I.

This case involves the dispute of an arbitration award. Plaintiff asked this Court to vacate the arbitration award; Defendant moved to confirm the arbitration award, and Plaintiff moved for summary judgment vacating the award. This Court has jurisdiction under section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, and Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10.

Plaintiff Swepco Tube, LLC ("Swepco") is a New Jersey corporation that produces stainless steel pipes. Defendant Local 427 ("the Union") covers a bargaining unit of 75 production and maintenance employees of Swepco. The parties have a long-term relationship. Swepco and the Union entered a collective bargaining agreement ("the CBA") for the period of February 1997 through February 2000. Sometime in 1998, the parties reopened negotiations to extend the agreement for two years (through February 23, 2002). Pursuant to these negotiations, Swepco's contribution rate to the Allied Industries Insurance Program Health and Welfare Plan ("the Welfare

Plan"), was set at $500 per month, per employee through February 2002.  When this extension was about to expire  (October 2000), Swepco requested that the CBA be extended through February 23, 2004.  The parties discussed numerous terms, including Welfare Plan contributions, and agreed to such an extension on October 27, 2000.  It is the terms of this extension which are in dispute in this case.  According to Swepco, during negotiations, the Union requested that Swepco increase contributions to the Welfare Plan for the first year of the extension (2002-03), but Swepco balked (Ordini Decl. at ¶ 14).  According to the Union, the parties had agreed that the contributions *would* increase in the 2002-03 year, and that the final CBA language contained a "typographical error" that was overlooked by both parties.

At the time negotiations were completed, Swepco labor relations consultant and negotiator Louis A. Ordini ("Ordini") drafted a handwritten memorandum of agreement ("MOA") which was read to the parties and sent to the representatives of the Union.  The handwritten MOA stated that on February 23, 2003, and February 23, 2004, the contribution rates would increase by $30.00.  The Union did not object, and thereafter Ordini prepared a formal MOA containing the very same contribution terms, which the Union representatives executed in acknowledgment and agreement. The Union did not notify Swepco that the dates were incorrect.  The terms stated in the MOA were incorporated into the CBA dated February, 2001.  On February 9, 2001, Ordini forwarded the MOA, an outline of modifications, and the CBA to Dorothy McBride ("McBride"), union negotiator and Welfare Plan Administrator, asking her to review same and contact him to "discuss any corrections." (Ordini Decl. at ¶ 26, Ex. E).  No one from the Union contacted Swepco.  The contribution terms of the final CBA state:

> 1. Monthly contributions for each eligible and covered employee shall be $500.00 per month through February 2000.
> 2. Effective February 23, 2000, the monthly composite contribution for each eligible employee covered by the Allied Industries Health and Welfare Plan shall be increased to $525.00.  In the month of February, the payment shall be pro rated.
> 3. Effective February 23, 2001, the monthly composite contribution for each eligible employee covered by the Allied Industries Health and Welfare Plan shall be increased to $550.00.  In the month of February, the payment shall be pro rated.
> *4. Effective February 23, 2003, increase premium by $30.00 per month to $580.00 per month, maximum.*
> *5. Effective February 23, 2004, increase premium by $30.00 per month to $610.00 per month, maximum.*

(Giblin Cert. Ex. A at p.5, Art. 9, Sec. C.4 and C.5) (emphasis added).[1]  Paragraphs 4 and 5 of the CBA contain the same terms set forth in the handwritten MOA and the formal MOA.

The CBA was signed by both parties and was issued in booklet form.  Subsequently, on May 1, 2001, Ordini alerted McBride to several errors in the booklet unrelated to the Welfare Plan contribution dates.  The Union, after review of those errors, still did not express any objections regarding the contribution dates because, according to Union representative Tom Fagan ("Fagan"), he only reviewed the specific errors highlighted by Ordini, and not the entire CBA at that time.  In accordance with the terms of the CBA, Swepco paid out $550.00 to the Welfare Plan for each employee in 2001 and 2002, and increased the contributions to $580.00 in February of 2003.[2]

---

[1] Swepco points out that the "freeze" in contribution levels for the year 2002-03 was similar to a "freeze" for the two-year period from March 1998 through February 2000 that was previously negotiated by the same parties to the same CBA (Ordini Decl. at ¶ 17).

[2] The final increase of $30.00 (to a total of $610.00) was to take effect on February 23, 2004, the last day of the CBA.

3

During this time McBride, the Welfare Plan administrator, did not alert Swepco that it was violating the terms of the CBA.  The first indication by the Union to Swepco of any alleged breach was on December 29, 2003 – three years after the negotiations, and after two years of payments.  Pursuant to the CBA, the dispute ended up in arbitration.

Arbitrator J.J. Pierson ("Arbitrator Pierson" or "the Arbitrator") held a hearing to decide whether the parties had agreed to an increase in distribution in the 2002-03 year or the 2003-04 year.  He heard evidence from both parties concerning the negotiations and the terms of the agreement, and issued an Arbitrator's Opinion ("A.O.").

The Union presented the following evidence to the Arbitrator.  Fagan testified that the union proposed a yearly increase, and there was no discussion of having an increase become effective on the last day of the CBA (February 23, 2004) (A.O. at p.7).  He further noted that he believed the dates in the MOA to be in error, but let the mistake "go by." (A.O. at p. 7).  The Union highlights as critical evidence of intent, a letter from the AON insurance company, the Union's auditor and insurance carrier ("AON").  The letter indicates that increases over the years of the extended CBA– including 2002 and 2003 –"would not jeopardize the fund."  (Giblin Cert. Ex. B).  McBride indicated that after reviewing this letter, Swepco had agreed with the company proposal for yearly increases and that there had been no discussion of skipping a year (A.O. at p. 8).  McBride further testified that she did not realize the "error" in the CBA until 2003 because she was undergoing treatment for breast cancer (A.O. at p. 9), and that the Union's bookkeeper and accountant were merely following the CBA without realizing the alleged error (A.O. at p. 9).

Swepco presented the following evidence to the Arbitrator.  Ordini testified that he reduced the terms of the CBA extension to a handwritten MOA which he read to the parties and faxed to

Fagan; no one at the Union indicated the existence of any errors (A.O. at p. 9). Ordini further testified that Swepco had agreed to incremental increases in contributions and asked for no increases in the 2002-03 year, and that the parties had "agreed to a bye" in that year (A.O. at p. 10). Ordini justified the last-day contribution increase (February 23, 2004) as a "floor" for the next extension of the CBA (A.O. at p. 10).

Next, Ken Schultz, President of Swepco ("Schultz"), testified that he understood the contribution increases to be frozen in 2002-03 because the issues were discussed during the negotiations and the parties had "agreed there would be 'no increases in 2002.'" (A.O. at p. 10). Furthermore, Swepco Vice President of Finance Steve Oberhelman ("Oberhelman"), testified that contributions were paid out according to the terms of the CBA, with no change in contributions from January 1, 2002 through February 2003 (A.O. at p. 11).

After hearing all of this evidence, Arbitrator Pierson ultimately concluded that the MOA of December 22, 2000 (and thus the CBA) contained a "typographical" misstatement of the intent of the parties formed pursuant to the negotiations in 2000. Arbitrator Pierson concluded that the document drafter had not expressed the mutual intent of the parties – which, the Arbitrator concluded, was to have an increased contribution in the 2002-03 year. Arbitrator Pierson thus reformed Article 9 of the CBA to change the contribution increase dates to February 23, 2002 and February 23, 2003 (rather than 2004), and ordered Swepco to pay the difference in damages. Swepco filed this lawsuit seeking to vacate the arbitration award. The Union filed a motion to confirm the arbitration award, and Swepco simultaneously moved for summary judgment vacating the arbitration award.

II.

"Arbitration awards enjoy a strong presumption of correctness." *Five Star Parking v. Union Local 723*, 246 Fed. Appx. 135, 139 (3d Cir. 2007). Arbitration awards will be upheld if the award is one "that 'draws its essence from the collective bargaining agreement.' Although an arbitrator's interpretation of a collective bargaining agreement is accorded substantial deference, it may be vacated if the arbitrator demonstrates manifest disregard for the collective bargaining agreement." *Id.* (internal citations omitted). In other words, "if the arbitrator's interpretation is in any rational way derived from the collective bargaining agreement, the arbitration award will not be disturbed." *Pa. Power Co. v. Local Union No. 272 of the Int'l Brotherhood of Elec. Workers, AFL-CIO*, 276 F.3d 174, 178 (3d Cir. 2001). "Manifest disregard for the CBA is established when the arbitrator's award is totally unsupported by principles of contract construction." *Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs*, 357 F.3d 272, 279 (3d Cir. 2004) (internal quotations and citations omitted). As long as the "'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000) (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)). "Whether or not we agree with the arbitrator's application and interpretation of the contract is irrelevant," but "if an examination of the record before the arbitrator reveals no support whatever for his determinations, his award must be vacated." *NF&M Corp. v. United Steelworkers of Am.*, 524 F.2d 756, 760 (3d Cir. 1975).

While the Court is aware of the substantial degree of deference given to arbitrators in matters such as these and the narrow scope of the Court's review powers, it is the Court's finding that this

is a case that warrants vacation of the arbitration award. The Court cannot find that the Arbitrator's decision "draws its essence from the collective bargaining agreement" because Arbitrator Pierson demonstrated a "manifest disregard for the CBA" by issuing an award that is unsupported by hornbook principles of contract law and construction.

First, in determining the intent of the parties to a contract, "[t]he plain language of the agreement guides our construction: '[a] court is not authorized to construe a contract in such a way as to modify the plain meaning of its words, under the guise of interpretation.' . . . 'The court should . . . avoid ambiguities, if the plain language of the contract permits . . . . [and] should not torture the language . . . to create ambiguities.'" *Wall St. Aubrey Golf, LLC v. Aubrey*, 189 Fed. Appx. 82, 85 (3d Cir. 2006) (internal citations omitted). An arbitrator similarly "may not ignore the plain language of the contract." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987).

In this case, the plain language of the contract is clear and unambiguous and does not "admit[] of more than one reasonable construction." *Id.* As stated above, the CBA clearly indicates a contribution increase in 2000-01 and 2003-04. There is no language anywhere on the face of the contract in Article 9 regarding a contribution increase in 2002-03. Arbitrator Pierson exhibited disregard for the principle that primary importance is given to the plain language on the face of the contract. He thus "ignore[d] the plain language of the contract" in contravention of the Supreme Court's rule set forth in *United Paperworkers*. Furthermore, if an arbitrator's award "has deviated from the plain meaning of a labor contract provision, it must find support in the contract itself or in prior practices demonstrating relaxation of the literal language." *NF&M Corp.*, 524 F.2d at 759. As noted, Arbitrator Pierson's award finds no support in the CBA itself. Furthermore, there is no

indication of any prior practices that would lend support to the contention that the parties had intended to include the 2002-03 increase. In fact, as mentioned above, prior practices in this case indicate that the 2002-03 "freeze" in contribution level was not out of the ordinary – a similar "freeze" had occurred previously (March 1998 to February 2000) (Ordini Decl. at ¶ 17).

Second, Arbitrator Pierson found that the doctrine of mutual mistake justified reformation of the contract. Mutual mistake occurs "[w]here both parties share a *common assumption* about a vital existing fact on which they based their bargain and that assumption is false." Joseph M. Perillo, Calamari & Perillo on Contracts § 9.26, at p. 361 (5th ed. 2003) (emphasis added).[3] "As a prerequisite to reformation, Appellees must show by clear and convincing evidence that a mutual mistake was made in the collective bargaining agreement." *Meza v. General Battery Corp.*, 908 F.2d 1262, 1275 (5th Cir. 1990). It is customary and appropriate for arbitrators to pass upon claims for reformation for mutual mistake, often applying principles more liberal than judicial equity, and upon claims for rescission if the mistake was unilateral and the other party knew and took advantage of it." *Int'l Union of Operating Engineers v. Carl A. Morse, Inc.*, 529 F.2d 574, 580 (7th Cir. 1976) (internal citations omitted).

In this case, Arbitrator Pierson disregarded the clear tenet in the doctrine of mutual mistake that *both* parties shared a common erroneous understanding about a term or fact upon which they based their bargain. There may be enough evidence for the Arbitrator to find that the Union believed

---

[3] The casebook example of a common erroneous assumption is *Sherwood v. Walker*, 33 N.W. 919 (Mich. 1887). In *Sherwood*, the seller and buyer of a cow both believed that the cow was sterile, and the seller contracted to sell her for a very cheap price. However, before the consummation of the sale, the cow was found to be fertile, and thus worth up to ten times more than the contract price.

8

the CBA would include an increase provision for 2002-03,[4] although this evidence is tenuous because the Union had ample opportunity to review the final language of the MOA and the CBA, and Swepco paid out its contributions over several years without objection. However, there is nothing that remotely suggests that Swepco was in accord; hence, the doctrine of mutual mistake does not apply here.

There is little, if any, evidence that Swepco intended the CBA to include an increase in 2002-03. Swepco allegedly argued against such a term during negotiations, did not change the term at the time its representative, Ordini, found and corrected other errors, and testimony at the arbitration (Ordini, Schultz, and Oberhelman) suggests that Swepco did not intend on including a 2002-03 increase. Indeed, the testimony indicated that Swepco representatives believed the parties had agreed to omit the contribution increase in that year.[5] Thus there is no evidence – much less clear and convincing evidence – that Swepco ever intended to include the 2002-03 contribution increase term in the CBA. While the Union might have believed that the consensus was to include the increase, Swepco clearly believed that the parties had agreed to a rate freeze.

Arbitrator Pierson nonetheless concluded that "[e]xcept for the Memorandum of Agreement, as written, there is not a shard of documented evidence that the Employer requested nor negotiated a freeze in contribution increase to the Plan in February 2002." (A.O. at p. 11). However, the "documented' evidence proffered by the Union is just as lacking – the only "shard" of documented

---

[4] This evidence would include the AON letter and the personal testimony of the Union representatives, as explained in more detail above.

[5] While it may seem peculiar that the rate increase skips a year in the middle of the agreement and allows for an increase on the last day of the CBA, this was explained by Swepco and the Court finds the explanation sufficient.

evidence is the letter from AON contemplating a yearly increase (to which Swepco was not privy). The remainder of the evidence on either side was in the form of testimony of the negotiators, which clearly indicates that the parties did not share a common misunderstanding that would lead to a finding of mutual mistake. Because only one party had an erroneous assumption about this contract term, mutual mistake simply does not exist, because the parties did not share a "common assumption" that was erroneous. Arbitrator Pierson disregarded this basic tenet of contract law, and based on the language of the CBA, there is no "rational way" that his conclusion was "derived from the [CBA]." *Pa. Power Co.*, 276 F.3d at 178. Thus, his award can be vacated because it does not draw its essence from the CBA.

### III.

The Court also finds that the Arbitrator exceeded the scope of his contractual authority. Normally "the arbitrator enjoys a wide latitude in fashioning an appropriate remedy, *in the absence of contractual restriction*, and is vested with power to decide broad issues of the parties' contractual relationships as well as specific grievances." *Int'l Union of Operating Engineers v. Carl A. Morse, Inc.*, 529 F.2d 574, 580 (7th Cir. 1976) (internal citations omitted) (emphasis added). Included in this scope of authority is the ability to reform based on mutual mistake. *Id.* This wide latitude on scope of authority only applies, however, where the case is not one "where the agreement expressly deprives the arbitrator of 'power to destroy, change, add to or delete from its terms', . . . ." *Id.*

A recent Third Circuit case is instructive in this regard. *Pa. Power Co. v. Local Union No. 272 of the Int'l Brotherhood of Elec. Workers, AFL-CIO*, 276 F.3d 174 (3d Cir. 2001). In *Pa. Power Co.*, a public utility company entered into a CBA in 1996 with the local union representing the

10

production and maintenance employees of an electrical plant. The CBA included, *inter alia*, a provision preventing the company from discriminating against employees based on their union status. The company had offered early retirement benefits under a separate agreement ("the cooperative agreement") in that same year, contingent upon "the production and maintenance employees' cooperation with management's efforts to improve efficiency." *Id.* at 176. In 1998, the company decided that early retirement benefits would not be paid out because the union had not satisfied the conditions of the cooperative agreement; however, the company did offer these benefits to supervisory personnel. The union filed a grievance which went to arbitration.

The arbitrator found that although the company had not violated the terms of the cooperative agreement, it had violated the anti-discrimination provision of the CBA by providing early retirement benefits to supervisory personnel but not rank-and-file personnel. *Id.* at 177. The arbitrator thus "directed that the voluntary retirement benefits be afforded to qualified bargaining unit employees at the Plant." *Id.* The District Court upheld the arbitrator's award. The Circuit Court reversed and vacated the award because, *inter alia*, the arbitrator "acted outside the scope of his contractually delegated authority. The Agreement specifically provides that the arbitrator may not alter or amend it." *Id.* at 179. The Circuit Court found that the arbitrator "altered the agreement in direct violation of its provision that he had no power to do so. He wrote into the contract that the Plant production and maintenance employees shall have the same benefits as the supervisory employees. The Agreement specifically excludes supervisory employees from its terms." *Id.*

Here, as in *Pa. Power Co.*, the CBA expressly deprived Arbitrator Pierson of specific powers to alter the CBA. The CBA expressly states, in Article 16 ("Grievances and Arbitration"), that "[s]aid arbitration shall not have any power to add to, subtract from, alter, change or modify any term

of this Agreement." (Giblin Cert. Ex. A at p.8, Art. 16, Sec. A).  Accordingly, Arbitrator Pierson went beyond his scope of power.  The parties clearly agreed to this limitation, and the Union does not dispute its existence or application.  Indeed, the Union simply argues that great deference is afforded to arbitration awards and the courts' judicial review thereof is narrow.  The Union argues that Arbitrator Pierson was granted the authority, in the CBA, to arbitrate all "plant-wide issues."  However, Arbitrator Pierson, like the arbitrator in *Pa. Power Co.*, "acted outside the scope of his contractually delegated authority" by writing into the contract a provision for a year 2002-03 increase in Swepco contributions to the Welfare Plan which clearly did not appear in the CBA.  *Pa. Power Co.*, 276 F.3d at 179.  Arbitrator Pierson changed the CBA "in direct contravention of its provision that he had no power to do so," *Id.*,  because an arbitrator "may not ignore the plain language of the contract," *United Paperworkers*, 484 U.S. at 38.

The Court ordinarily gives great deference to an arbitrator's decision and reasoning; however, it is not a "rubber stamp."  In cases like this where an arbitrator clearly misconstrues contract principles and acts beyond his scope of authority, the function of the Court is to rectify the erroneous actions of the arbitrator.  *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

Based on the reasoning above, the arbitration award is vacated, and this case is hereby closed.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

March 17, 2008